The next case, United States v. Smith, has been submitted on the briefs. The next case on calendar for argument is Rose v. Hedgpeth. Good morning, Your Honors. John Cratchley of the Federal Public Defender's Office, appearing on behalf of Michael Rose, the appellant petitioner. Your Honors, I'd like to reserve two minutes, and I'll do my best to police myself. All right. Understanding that this may take at least two sentences, I do want to— I'll give you a five. I think it's—as a threshold matter, I think it's important to keep in mind throughout the discussion and, you know, just thinking about this case, there's sort of two undisputed points here that really kind of bookend it. The first is sort of the front end of it, which is that this is not the typical federal habeas appeal to the extent that— and this is, as the Court is aware, this is the second time this case has been before the Court. But you think it's not typical because the first panel decided that Hedgpeth's not going to apply? That Hedgpeth doesn't— The difference is—okay. Yeah, that's—Hedgpeth doesn't apply. Okay. What's the other— That there was no procedural bar issues in the case. Right. And that there's no 2254E2 issue because the case was— it was an effort, a good faith attempt, to develop the case fully. Right. But on remand, then there was the evidentiary hearing. Right. And I don't know that any of that survives, by the way, after Shin v. Ramirez, but you've briefed this as though we're going to consider all that evidence that was introduced on remand, right? Right. Okay. So, assuming that it does, why would it change the outcome? It just—it— You're here to convince us that there was Strickland IEC, right? Yes. Okay. Yes. And I'm just making— Sure. Just generally making the point that the usual sort of reasonableness, you know, the extremely difficult sort of standards that we typically apply. Yes, but you still have—you still have—you don't have the double level of deference, perhaps. Right. You've got Strickland, and that's a small thing. Yes. Right. So, on prejudice, I'm looking at the prejudice prong. Which is the other bookend, Your Honor, which is that prejudice in this case, and the determination of prejudice, and something I think that the district court and the R&R really gave short shrift to and really didn't discuss it fully, was that you gauge prejudice by the—one of the things you look at is the closeness of the case. This was a case where the jury was—they deliberated over— Almost hung. And the first panel recognized that. Right. Yes. Okay. But here we are, and they got their hearing. That's also unusual. To get the evidentiary hearing, I mean, but you got the evidentiary hearing, so I'm looking at these three bits of evidence that you've got, the two witnesses and the video. Right. So, can you tell me why would it tip the— Well, keeping in mind that we had a jury that was at a virtually equal poise, and it was like a tipping point, and they were clearly troubled by Denman's testimony, I think. They sent out notes asking almost exclusively for information, seeking further clarity on Denman's story. And what the jury never heard, because counsel who had 16 months to prepare for the case, who at a minimum knew that there were two witnesses out there who had had narrative conversations with Mr. Denman, the complaining witness, the key to the prosecution's case, had had conversations about that incident. He had reason to believe that— May I interrupt and save you some time? What if we assume Strickland Prong won? Right. The more should have been done to go to those witnesses and to get that video. Can you speak to Strickland Prong 2? Prejudice. The prejudice is what counsel could have presented and what the jury never heard, and that was that Denman indicated—and you have to keep in mind, Denman—and I don't know if any of— We have been over—this is an important case. We have been over this record, counsel. You've got to tell me why this is prejudicial. When I look at the video—maybe I could do it this way. The video of Denman speaking about—he said a couple of things that are internally consistent. He said that Rose didn't get any money. Rose testified that he got $500 of house money. Right. And he said Rose didn't shoot anybody. But we know that—I think the evidence is pretty compelling— that Rose was in the house because Faulkner said she recognized his voice, and Denman's out in the car. Right. So whatever he said on the video about who shot, he just would not have had any personal experience to be able to make that observation, right? How does the video help him? What about the part where he said that he expressed that because it was Rose's people that committed the murder, he wanted Rose to go down? Wouldn't that show some motivation for— Yes. Bias. Wouldn't that show bias or motive to falsely accuse Rose? Absolutely. That's what the first panel thought. But it seemed to me the gestalt is that you almost ran a different theory the second time around. So the first panel heard, I think you argued, that Rose—forgive me— that Denman wanted Rose to pay because his cousin, Shorts, is the one who really was doing the shooting. Is that a fair summary? But the two witnesses that were called in, you know, the first panel was impressed by that and concerned. But the two witnesses had this hearsay of hearsay of what do we do about this? Well, I disagree just as a matter of state law with those hearsay objections. The observations that Rose appeared to be scared, police officers testify about suspects appearing scared all the time. That's admissible in state court. And you had a compelling duress defense, and you ran it, right? And they heard that. I mean, your client testified. I wasn't his attorney, but yeah, he testified at trial. Right. And he gave stories, incidentally stories. He gave an account of what happened that turned out to be exactly congruent with what Mr. Denman was later federally indicted for, dealing in half kilos of cocaine. So I'm going to get out of your way, I promise. But what is your strongest prejudice argument on Strickland Prong 2? The strongest prejudice argument, given that we have a jury that's on the border, is that here's the testimony, and it goes beyond the video, that frankly it's mostly Ms. Bolden's testimony. Okay. That because Rose should pay because it was his cousin who did it, not because Rose did it, but because his cousin did it. And her testimony is that Denman said that. Yes. Counsel, were there any defense witnesses put on other than the defendant? I don't believe so, no. And so these witnesses could have corroborated his duress defense. Absolutely. And they would have corroborated not only this sort of vendetta because it was Rose's cousin who did it, but that Denman was angry, and again this goes to bias and motive, that Denman was angry because Mr. Rose failed to protect him, that he just sat there like a coward. This would also be consistent with duress as opposed to active participation. All of this goes not only to corroborate the duress defense, but to impeach, significantly impeach, really the one witness. This case couldn't have been made without Mr. Denman, obviously. He was really the key to the case, as this court recognized in the first opinion. And we showed the magistrate. The evidentiary hearing, quite frankly, we thought went pretty well in district court, and we were very disappointed with the R&R. It seemed to make, it's almost as if the court, I can't speculate, but that it was sort of applying this sort of standard federal habeas sort of inference or presumption that we're supposed to lose. And I also want to make it clear that this was not based on credibility determinations. I think the R&Rs have the entire transcript of the hearing. It was a half-day hearing. So what's your strongest prejudice argument, your strongest prejudice argument on Strickland? That if the jury had heard that because Rose failed to protect Denman, that Rose was going to go down with him, that Rose should pay because it was Rose's cousin who did it, that Denman heard other people at the scene with shorts saying, should we kill Rose now, which is perfectly consistent with the duress defense. One of the themes that the prosecutor used in his opening, in his first sentence of his closing statement was that Rose did this because he was jealous, which both of these witnesses, Bell and Bolden, would say was not true. You're relying on, for your strongest prejudice argument, you're relying on Bolden, not so much the video. True. Okay. Yeah. And I think that if you view all of this taken as a whole, the video, and I don't want to rank them, but the video, Bell, who would show that this wasn't just a one-witness defense, one third-party witness. Testify at the hearing, at the evidentiary hearing, right? Her interview statements were stipulated into evidence. Right. Okay, so the defense counsel, if I can go over. Oh, sure. May I go over? Yes, you may. The defense counsel testified at trial counsel, testified, I think, at the evidentiary hearing, that he said it was a surgical decision. He was concerned about sort of aggressively cross-examining the victim because he'd been very sympathetic because he's a victim of a horrible crime, lost his mother, lost so forth. His mother survived. And concerned, oh, forgive me, and the nephew, did not forgive me, and shot himself. Right. So he's concerned about that, which sounds very strategic to me, and then testified that he knew what those two witnesses were going to say, although he hadn't interviewed them himself, and he wanted the jury to hear it straight from Denman, not from them. Of course, I'm paraphrasing, but could you speak to that on prong one? Why were those decisions not strategic, not reasonable? Why did they fall below an objectively reasonable standard? That's what we would have to rule. The more important is the latter thing. But in terms of the trying to be sympathetic with the victim, with Mr. Denman, if you read the transcript of his cross, it really doesn't come across as very sympathetic at all. He accuses him of being a drug dealer, which we think was later shown to be true, that he had high-powered rifles and that sort of thing. And that was not a justification he gave to the trial judge during the Marsden hearing. I think that's a post hoc sort of explanation or rationale. But more importantly, he didn't get everything he needed from Denman. He didn't even subpoena Bolden and Bell, and Bolden and Bell would have supplied the why, the bias, the why Denman was testifying the way he was. The defense counsel was testifying from his memory because he lost the file. So what he said was really not that reliable because he admitted that he lost the file. He had no notes, nothing to it, which is sort of prima facie evidence of malpractice. And I'm sorry, I'm way over time, but very briefly I want to say I've tried many criminal cases, and the idea that I would wing it with the prosecution's witness to hope that I could get from him. And if you can get it from the prosecution witness, that's good. Tactically, that's always better than having to present your own witnesses who may be subject to cross. But to go 16 months knowing at some point that these witnesses are out there, and they're not in another country, they're in the county, and to not find out their full statements, which was not just that Rose didn't do anything or Rose didn't shoot anyone, but that they talked to Denman and Denman said, here's why I'm going to make sure Rose goes down. And to not have them at least subpoenaed and in the hallway at trial is mind-boggling. That's very rare that you have witnesses who've talked to the victim. That happens very rarely. Right, right. But anyway, I've exceeded my time. Thank you. We'll give you a minute for rebuttal. Let's hear from the state. Good morning, Your Honors. Christopher Beasley, Deputy Attorney General, on behalf of the respondent. The court had asked the parties to talk about Shin v. Ramirez. And if the court will indulge me on that, I'll spend a few minutes on that. I think that Shin v. Ramirez does confirm the tremendous barrier that's erected for federal habeas evidentiary hearings under Section 2254E2. Prior to the evidentiary hearing that happened in this case, before the first panel, I had argued that Rose had failed to develop the factual record in the state court. And I had relied at that time on Baha v. Dusharm out of this court by arguing that he had the opportunity to present declarations and affidavits and whatever evidence he could muster in support of his allegations that he was presenting, but he didn't do any of that. That had been at the Morrison hearing? No, this was in state collateral proceedings. Okay. Yeah. He had the opportunity to present anything and everything in those state collateral proceedings, but didn't. And all he relied upon was his own self-serving statements in support of his claim. Well, under California law, the Supreme Court has said, you're required to present any reasonably available documentary evidence that substantiates your claim. But, counsel, aren't we beyond that point now? Because the prior panel said that he didn't fail to fully develop his case. So isn't that the law of the case for us now, and we can't revisit that? Well, on one hand, yes, it could be construed as law of the case. Have you construed it any other way, counsel? I don't want you to skip over that because I think we're bound. So I think that the prior panel did not have the teaching and the counsel of Shin, right? And so I think that with Shin now as the supreme law of the land, you look at this as, okay, if Shin had been around, could that first panel have actually ordered an evidentiary hearing? I think the answer under Shin is no, that Rose did not develop the facts as he was supposed to, and he didn't fit within the narrow exceptions that 2254E2 presents. So in light of Shin, this evidentiary hearing should never have happened. That's all I will say about Shin versus Ramirez. Well, actually, unless we ask a question, which I'm about to. The hearing happened, all right? Yes. The hearing happened, and this is not the only case where that will have been. In the rear of Ramirez, now we have this new Supreme Court authority. Is it your position, is it the government's position, that we don't consider this new evidence? Or what is your argument? My argument is that that evidentiary hearing should not have happened, that Rose should be entirely confined to the evidentiary record that was before the state court. I think that means yes, because the hearing happened, right? The hearing happened. So my question is, do we not consider that new evidence? That's correct. That would be my position on that, that yes, the evidentiary hearing should never have happened, and even though it did, that is irrelevant under Shin. That should not be considered. Does it matter that the prior panel said that he did not fail to adequately develop the record in the state court? What do we do with that determination that's already been made? I think that you have to look at that prior determination in light of the fact that the prior panel did not have the benefit of Shin. Had it had the benefit of Shin, it would have realized, oh, yeah, he failed to develop the record and would not have ordered the evidentiary hearing. So if we can say that. I'm sorry? I don't feel comfortable saying that that's the way the case would have come out. Well, I mean, that's your prerogative. You wear the black robes. But it's a really critical intersection in this case, so perhaps we need briefing on that question because it seems to me to be a serious pivot point here. It is. It is. And I think that it is worthy of additional briefing because the Shin case is so almost watershed in some respects in terms of declaring how narrow the rule is for when you can get a federal evidentiary hearing or not. So under our precedent, that case would have to be irreconcilable with Shin in order for us to deviate from it. So is it your position that the prior panel opinion is irreconcilable with Shin? Yes. Yes. I think that the prior panel completely messed up, with all due respect, completely messed it up. That's a different question. That's a different question. Whether you disagree with the premise that the petitioner adequately developed the record in state court. That's not the question I'm asking you. I'm asking you whether the decision made by the prior panel is irreconcilable with Shin, the language of Shin. Is it irreconcilable with that case as it is written? Yes. And the reason why it's irreconcilable is because the prior panel concluded that Rose had failed to develop the record by faulting the state courts, whereas Shin says the onus is on the petitioner. That's the irreconcilable difference. That's what's irreconcilable. You don't put the onus on the petitioner. The difficulty is, right, why wasn't the evidence, again I'm paraphrasing, why wasn't the evidence submitted in the state court and the evidence from the defendant is that counsel had the video and that counsel knew about these two witnesses. And that's the difficulty, it seems to me, and that's why I think we might need some briefing. But could you go to, if we consider the evidence and respond to the Strickland prong one, Strickland prong two. It seems to me, I'll tell you, on Strickland prong one, it's really hard for me to understand not following up with these witnesses. And then, of course, you're very familiar with the record, so there's a video, this is extraordinary, a video of somebody on the Internet, a victim speaking about this, of course, exceptional. And I think uncontested testimony from Rose's mother that she gave the video to previous counsel, right, then she followed up to make sure previous counsel had given it to the trial counsel, you know the record. Hence my focus on Strickland prong two. But am I wrong about Strickland prong one? Yes. And the reason why is because, as to the video, so I'll first talk about the video. So we do have uncontested evidence from Rose's mom that she gave the video to former counsel. But former counsel, we don't have, he suggests that he handed everything over to defense counsel. Defense counsel was unsure that he was unsure, he never had seen the video before. He said he was unsure and he said, I'd remember that, because that's a really unusual circumstance. So we infer he didn't see it, right? Right. Why does that not fall below an objectively reasonable standard for the homework necessary for a trial of this caliber? So because even though Ramos now testifies that she gave this video, what's weird here is that why wouldn't Ramos, why would she not have told Rose about it? She said she couldn't even afford, this is not a happy moment for the government, she said she couldn't afford to be making those phone calls to jail. And that's a whole different class action about the cost of the prison phone calls, or pretrial. But that's what she said. She couldn't afford to contact him. With a phone call, certainly, but that doesn't mean that she's not writing him letters. There's no evidence of this, but the point that she does not let him know, that he doesn't know anything about this video, and then when the Marsden actually happens, nothing is brought up about the video, renders it suspect. It renders it impossible. Counsel, this is not persuasive to me. Previous counsel said he gave the video to, and this is an exceptional video. So if you're not persuading me on that, and just to be frank, you're not, then on the video you must be relying on Strickland-Plonk too. And the video does not help the defense. The video is consistent with what Denman testified to, consistent with how this crime started, consistent with Denman having felt like he had been betrayed, how Rose had asked him for a ride to his aunt's house in Los Angeles, how it was the shorts that came out, and then these men accosted him and tied him up. That's all consistent. The only things that happen in the video that have some marginal inconsistency is where Rose or Denman says that Rose didn't shoot anyone and that Rose got no money. That's the only thing. That he didn't do anything and that he had to go down because his family did it. None of that is in the video. I'm sorry? None of that is in the video. He does not say that. Okay, but Bolden did. That's how you get to the two witnesses, right? Right. And so on the two witnesses, then we have the opposite problem. On the two witnesses, you heard opposing counsel argue very persuasively, they're in the county, right? They're witnesses who have talked to the victim and say the victim makes these representations that we've just reviewed. Why was it objectively reasonable to not have those women at that trial? So that's because at the Marsden hearing, Duncan, the counsel, explained he had statements, at least for Bolden, what he termed detailed statements. And the district court credited Duncan for that. It gave him credibility on that. It said, yeah, he had those statements, and he made a reasonable determination based on what he had before him that I don't need to pursue this any further. That's as to Bolden. As to Bell, I have no answer as to the deficiency prong on that. He could have and should have probably talked to her. But even setting prong one aside, even then, neither Bolden nor Bell actually helped. Bell, for example, in her, not testimony, but in her statements to investigators, she explicitly stated that she was never under the impression that Denman was trying to fabricate or trying to get Rose in trouble for something that he had not done. She made those explicit statements. While Bolden said that he wanted, he wanted Rose to go, Denman wanted Rose to go down because it was his family, the district court also made a credibility determination that Bolden was an interested witness. She's the mother of Rose's child. She refused to talk to our investigators. And the court was in the position to sit and evaluate her credibility while she testified live in that evidentiary hearing. So those credibility determinations are binding on this court. So looking at- They're not binding. I mean, if they're clearly erroneous, we can- That's correct. That's correct. And there's nothing clearly erroneous in what was presented in this case. And so Bolden's credibility is questionable. So you take Bolden's evidence and you take Bell's evidence and you take the video, everything together, none of this was of such a compelling force that would have placed this case in a different light for the jury. It would have still bolstered Denman's testimony, trial testimony about what actually happened and would have confirmed Rose's guilt. It would not have undermined Denman's credibility. It would not have undermined the case at all. And so there was no prejudice in this case. Counsel, I have two problems with this case. Well, I have several problems with this case. One is that counsel lost the file, and there was evidence in the record that he was overwhelmed and that he was flustered by the case. And so his-after the fact recollections were not based on notes, they weren't based on the file, they were just kind of scattered memories. Does that have-should we take that into consideration? I would first-no. I would first contest the court's characterization that this was a flustered attorney, that he was not able to- Well, that's not my characterization. That was the characterization of the investigator. And the investigator on cross-examination did further explain that Duncan handled himself professionally, and he was not-he was not at the trial, so he was unable to comment on how the actual trial played out. And so I would dispute that characterization of Duncan. What about the lost file? Does that-is that indicative of someone who's performing at a level of reasonable competency? I don't think that the loss-I think the loss of a file, while unfortunate, I don't think it speaks to whether an attorney is competent or not. Some accidents happen. Sometimes things like that happen. And in this case it did. It's unfortunate that it did, but it did. And it doesn't speak to his competence at the time of trial or his reasonableness and his ability to represent Rose at the time of trial. So I don't think this court should credit that at all or take that into consideration. What about the closeness of the case and the questions that were asked, most of which-there were numerous ones, and most of which pertained to the testimony of Rose and the duress issue? What about-what should we make of that? I think that you make of that that this is a jury that's taking its responsibility very seriously. This is a jury that's looking at the evidence, doing the best that it can to figure out what happened, doing the best that it can to weigh credibility, doing the best that it can to weigh all aspects of the evidence. And ultimately, when push came to shove, was able to reach a verdict. This is-this is not the kind of case where this was so, so close that any of this would have made a difference. Well, it was very close. This was about as close as you can get in terms of all of the other defendants were convicted readily, and the jury deliberated quite a long time and was really close to a mistrial on this case. So it was closer than a lot of ineffective assistance of counsel cases that we see. But it was not so close that any of this would have made a difference. Well, that's the question that we have to answer. I agree with that, and that's why you get to wear the black robes. And I would urge this court to affirm the district court's decision. The district court-the magistrate judge and the district court went through this very carefully with a very detailed report and recommendation. All of these arguments were raised in the district court in the objections. The district court went through each of those objections and very carefully issued its order, accepting the report and recommendation. And I would urge this court to affirm the district court's denial of habeas relief. All right. Thank you. Any other questions? No. Rebuttal? Thank you, counsel. Thank you, Your Honor, and I'll try to be very brief. In terms of Ms. Bolden's credibility, the court-the district court, the magistrate judge, who actually held the hearing-the word demeanor doesn't appear anywhere in the lengthy R&R. It was all fact-based, and I think this court has a transcript. It's been submitted as part of the excerpts. It's a full transcript of the evidentiary hearing in federal court. She did it on sort of fact-based things that she's the mother of Mr. Rose's child, that she wouldn't talk to the AG's investigators when three strange men showed up unannounced at her doorstep, those sorts of things. And the court is just as capable of weighing those as the magistrate judge was. I would have called her at trial even with that baggage because what she had to say was far more important and no defense witness is ever going to be immune from cross-examination. And, therefore, the fact that there were comments on credibility in the R&R doesn't immunize the R&R's findings from review. That's the point I'm trying to make. More importantly, though, on Shin, I don't think-I mean, in my office, we view Shin with great dismay, obviously, but I don't think it's the sort of sea change that Penholzer or Richter or those sorts of cases are. Shin is, we would argue, limited to its facts, which was through-and this was touched on in the discussion with the state's counsel, where because of the fault of the petitioner, the issue was not presented in state court and, therefore, the state court never really addressed the merits of it. Here, it was the fault of the state. Why is that? You've heard me say, wait, the defense counsel had the video and knew about these witnesses. Why was it the fault of the state? No, I'm talking about as the prior panel in this court found, there was an effort here- But the prior panel didn't know what we now know through this evidentiary hearing that perhaps shouldn't have happened, so it's a little bit of a mind teaser, right? But I think it's very clear that the video, the evidence in this record is that the defense counsel had the video and knew about these witnesses, and so I read Shin on at least this part of Shin to talk about whose fault was it that that evidence wasn't offered at the state level. You think it's the fault of the state. Why? Because Mr. Rose, when he became a habeas petitioner after his- He, as a pro se litigant in prison, put together a handwritten habeas petition on forms that laid out the broad parameters of this claim. He doesn't have investigators. He doesn't have people to run around and find the video or to interview these people like we did. And his, under state law, his allegations that generally really pretty closely track what we're still talking about today were presented to the state court. The state court summarily denied it, and so he never had the opportunity to develop the evidence in state court. Shin doesn't change that scenario. Shin is where the defendant, through some fault that's attributable to the defendant slash petitioner, doesn't develop something in state court, then you- What was at issue in Shin in both the Ramirez and the Jones cases, it's actually two cases, was having lengthy hearings in federal court to determine cause and prejudice why this wasn't raised in the initial state petition. It's a procedural default case. Shin is a procedural default case, and this is not a- It's an exhaustion issue, really. It's a what? Here, this claim was raised in state court. Oh, exhaustion. That's right. So it guts Martinez, is what you're saying, and you don't have- We have a record where the state didn't raise the exhaustion issue for whatever reason. I mean, the first panel found that, right? Yeah, and it really isn't an exhaustion issue. I mean, you're always going to develop new evidence and new information, but here, this court in the prior panel essentially found that he was foreclosed from doing that through no fault of his own in his initial state habeas, and that's what sets this apart from the Shin case. There is no Martinez slash Trevino issue in this case at all, and if Shin is going to be interpreted to say that it would basically foreclose federal evidentiary hearings entirely, which the court says should be rare, but I submit that this is a case where even after- Well, the statute does allow for them. But I'm happy to brief it if the court wishes. Well, we'll let you know if we want additional briefing. Thank you. We'll send an order out. Maybe we can figure it out without your help at this point. Thank you both. I'll thank you, but we will let you know. Thank you both for your helpful arguments. Judge Allison, may we have a break? Of course. The case just argued is submitted for decision by the court, and we are in recess until 1120.
judges: RAWLINSON, CHRISTEN, Navarro